## Case No. 2,268.

### BYRD v. BYRD et al.[1]

[2 Brock. 179.][2]

Circuit Court, D. Virginia. May Term, 1825.

In pursuance of the interlocutory decree, recited in the last case, the commissioner to whom the accounts were referred, made his report in May, 1825, showing the amount of debts paid by the executrix of William Byrd, out of the personal fund for which the estate was bound. The commissioner's account contained two parallel columns, one showing the amount in paper money paid in discharge of bond debts, and the other the value of the paper money in specie, according to the scale of depreciation as applied at the periods at which those debts were paid respectively. This account exhibits very strikingly the steady and rapid progression of the depreciation of the paper currency of the country during the time embraced within it. Of one hundred and twenty-five slaves left by the testator, William Byrd, (besides the jointure slaves of the widow, in which she had a life estate,) ninety were sold under the will immediately after the death of William Byrd, viz.: in April, 1777, and the fund arising therefrom being wholly inadequate to the payment of his debts, the residue were sold in November of the same year. The first debts paid by the executrix in April, 1777, are credited in the account at the rate of 2½ dollars in paper for one in specie. The debts paid in 1778, are credited at five for one; those in 1779, from twenty-one to twenty-four for one, according to the period of the year at which the payments were made, and in October, 1780, when the last debt was paid by the executrix, the depreciation had reached the great depression of seventy-three for one! The aggregate amount of these specialty debts in paper money, including interest for twenty years, was $122,057.94, and in specie, $28,784.80.

MARSHALL, Circuit Justice. The principal question now to be determined is, what rule shall govern in ascertaining the value of the paper money paid by the personal estate in discharge of debts which bound the lands. It was decided at the last term, that the claim of the personal estate did not extend to the full relief which the real estate obtained, but to the actual burden borne by itself. That opinion is still retained. See 2 Brock. 176, 177 [Byrd v. Byrd, Case No. 2,267]. The parties have suggested three rules, by one of which it has been supposed that the value of these payments must be

[1] This is the same case in which an opinion was delivered by the chief justice, and an interlocutory decree in conformity therewith was rendered at the last term. For the points decided in this second opinion, the reader is referred to the syllabus prefixed to the first opinion delivered in the case [Case No. 2,267].

[2] [Reported by John W. Brockenbrough, Esq.]

ascertained. 1. The first is the value of slaves, according to sales made in specie some short time before the emission of paper. 2. The value of money, according to the scale of depreciation, for which the slaves and personal estate actually sold. 3. The third is the value of money, by the scale, at the time each debt was discharged.

If the actual value of the particular slaves and other property, constituting the subject of the present inquiry, was totally unknown, it would be necessary to resort to other extraneous evidence, for the purpose of fixing this value, and on the failure of any estimate made of the property itself, other less certain evidence would be received. In looking for this other testimony, that to which the counsel for the specific legatees have resorted, the actual sales of property of the same description, and, probably, of nearly the same value, would not be disregarded. But when the property itself has been actually sold, fairly and legally sold. its value is ascertained by that standard, which determines the worth of every thing. We cannot desert this certain standard for one which is conjectural. Had this sale been made for specie, no person would have resorted to other sales in order to ascertain the value of the property sold. That the sales were made for paper, can make no other difference than arises from a supposed misapprehension in the bidders at the sale, of the real value of the medium in which it was made. This value was afterwards established by the legislature, who must be supposed to have been regulated by their knowledge of the actual state of the currency. The rule, probably, works unjustly in many cases; but it is a general rule, it has governed all the transactions of the day, and we cannot be sure that a departure from it would not work more injustice than an adherence to it. There were many circumstances to reduce the price of slaves and other property, at the time this sale was made. Our ports were blocked up, the produce of labour was unsaleable, and the nation was engaged in a war which would probably render this gloomy state of things of incalculable continuance. These circumstances might have great influence on the intrinsic value of property. Within our own recollection, changes almost equally great have taken place. Who would ascertain the value of property in 1787 by sales made in 1784? or the value of property at this day by sales made in 1817? It is not unreasonable to suppose that the sales of 1768, or of 1772, may afford as inaccurate a standard for the value of 1777. It is true that just ideas of depreciation may not have prevailed at the time, and had these sales been occasioned by the illegal or iniquitous conduct of the heirs, there might be justice in throwing the loss on them. But the sale was inevitable. The law required it; and the executor, whose duty it was to sell the personal estate, had no power to sell the

lands. There is, then, no blame attached to any person; no person could have brought the real estate to the aid of the personal, or have prevented its sale. The loss produced by that sale is one of those calamities which grow out of the state of things, and which human wisdom could not avoid. Equity, when it interposes in such a case, must consider all its circumstances, and the situation of all parties. In doing so, no reason is perceived which will justify a departure from the sales themselves, in search of any other standard to ascertain the value of the property sold, nor a departure from the state of depreciation, to ascertain the value of the money given for it. But supposing the scale of depreciation to furnish the rule, the parties still differ as to its application. The specific legatees claim the date of the sale, and the residuary legatees, the time when the money was applied in discharge of the debts.

That the time of payment does not furnish the true rate of reimbursement to the personal estate, was, I think, substantially decided at the last term, and I still retain that opinion. It is true, as has been urged by counsel, that if we personify the personal and real estate, and suppose one to have advanced a given sum for the other on a given day, the value of the sum on that day by the scale of depreciation, would have constituted the demand both in law and equity of the person making the advance. It would have been a legal demand, regulated by the law. But this case stands on distinct principles. The claim of the personal estate is not given or measured by the act of assembly. It originates in equity, and is co-extensive with its equity. This equity regards the gain of the real estate and the loss of the personal. There is no exact standard by which these are to be measured in the case which has actually occurred, but certainly the value of money, which in fact depreciated daily, at the time of its payment to the creditor, does not approach the actual loss sustained by the person making the payment, so nearly as its value when the property was sold to raise it. I felt some doubts whether, as the sales were probably made on credit, the scale at the day of sale or at the day of payment ought to be applied. I have supposed that the scale at the day of sale furnishes the true standard, because at that early stage of depreciation, it is not probable that the future rapid decline of the money was foreseen, and because the legislature has fixed the value of all contracts payable in future, at their date. I am therefore of opinion, that the value of the money advanced by the personal for the real estate, is to be ascertained by the scale of depreciation on the day the personal property was sold.

The next question is, to what sum are the specific legatees entitled from the general fund? This question has been already decided, so far as respects slaves given by name. Where they have been given by number, to be selected by the legatee, it remains to be decided by what rule their value or price shall be estimated. The testator constituted a fund for the payment of his debts, to consist in part of one hundred slaves. He then gave to his son John a choice of ten slaves, not to interfere with those which his wife might choose to keep. It appears that the testator left one hundred and twenty-five slaves at his death; of these, one hundred were withdrawn by his will for the payment of debts. It could not be intended by the testator that his son's choice should interfere with this fund. It must be made from the residue. Ninety-two slaves were sold in April, 1777, and the residue in November of the same year. The first sale must be presumed to have been made in pursuance of the will; and as the debts exceeded the fund, it would have been the duty of the executor, had he been limited to the number prescribed in the will, to have selected the most valuable for sale. It follows, that eight of the highest priced slaves sold in November, 1777, must be considered as part of the one hundred directed to be sold by the will, and John Byrd is at liberty to select ten from those which remain. He will be entitled to twenty years interest on this sum. If his legacy were to be satisfied out of the jointure slaves sold after the death of Mrs. Byrd, he would be entitled to interest only from that sale.

It has also been made a question what interest shall be allowed the personal estate on the sums it has advanced for debts for which the real estate was chargeable? I think it most consistent with the general course of the court, and with the justice of this particular case, to limit the interest to twenty years.